# Okie's Appeal.*

An auditor appointed to adjust and settle the accounts of a voluntary assignee,
under the Act of 14th April 1836, is confined to the account between the as-
signee and the *cestui que trust*. Third persons claiming adversely cannot inter-
fere in the settlement, but must resort to adversary proceedings.

The accountant may, however, if he chooses, pay over to adversary claimants,
or claim to hold as a stakeholder for his indemnity; and if he does so, the pro-
priety of it will be for the auditor to determine in the first instance.

APPEAL of J. B. Okie, trustee, Paul Farnham, and others,
releasing creditors, and Thomas Sheepshanks, from the decree of
the Court of Common Pleas of *Philadelphia* county confirming the
auditor's reports in the matter of the accounts of David Knox and
William Wilson, assignees, and William Wilson, surviving as-
signee, under an assignment executed by John Knox and James
Boggs.

In 1831 John Knox and James Boggs formed the firm of Knox
& Boggs, on the retirement of David Knox, a former partner. In
January 1836, George G. Wells and James A. Knox became part-
ners of the firm, which then took the firm name of Knox, Boggs
& Co. On 21st April 1836, George G. Wells retired, the firm
remaining as Knox, Boggs & Co.; the new firms in each instance
being merely continuances of the old ones, taking their assets and
assuming their liabilities. On May 10th 1837, John Knox and
James Boggs, with their respective wives, executed a deed of as-
signment to David Knox and William Wilson, (see *Hennessy* v.
*The Western Bank*, 6 *Watts & Serg.* 301,) purporting to con-
vey the estates, joint and separate, of John Knox, James Boggs
and James A. Knox, in trust for certain preferred creditors, then
for such creditors as should execute and deliver, in favour of John
Knox, James Boggs and James A. Knox, and of each and every
of them, a full, absolute and effectual release of all debts, dues,
claims and demands upon them, and upon each and all of them.

On March 6th, 1839, David Knox and William Wilson filed
their first account, charging themselves with $269,721.30, re-

---

* This case was argued at March Term 1845.

ceived as well from the separate estates of John Knox and James Boggs, as also from the estates formerly of Knox & Boggs, and Knox, Boggs & Co., and claiming credit for nearly an equal amount, as previously paid by them to preferred creditors.   This account was referred to an auditor, whose report, allowing the credits asked, was afterwards, Sept. 20th 1839, confirmed by the Court of Common Pleas.

On the 12th June 1840, they filed a second account, charging themselves with $48,613.36, received from the same sources, and claiming credit for about $36,000, as paid to preferred creditors.

On the 3d October 1840, William Wilson, as surviving assignee, filed a third account, which showed a balance in his hands, including the balance on the second account, of $32,702.02; both these accounts were referred to an auditor, by whom the credit for moneys paid to preferred creditors was allowed; and of the balance $9,772.82 was awarded to preferred creditors, and the remaining $22,354.45 distributed among releasing creditors.   This report was confirmed by the Court of Common Pleas, on May 1st 1841.

On the 6th February 1841, Mr Wilson filed a fourth account, showing a balance of $12,402.44, which was referred to an auditor, and by him ordered to be distributed among releasing creditors.   This report was confirmed by the Court of Common Pleas on July 17th 1841.*

No exceptions were filed to any of the above accounts, or the reports thereon, previous to their being confirmed as aforesaid.

A fifth account was filed by Mr Wilson on Dec. 8th 1841, which was referred to an auditor, and pending the audit, a sixth account was filed on Nov. 15th 1842; and afterwards, on Nov. 12th 1844, a seventh and final account; both which last were referred to the same auditor before whom was pending the fifth account.

The balance on these accounts was claimed by the releasing creditors, &c., claiming under the assignment on the one hand, and by J. B. Okie, trustee, &c., on the other.   The auditor awarded to Mr Okie the balance with which he charged the accountant, including some unpaid dividends, which had been awarded at audits of former accounts to preferred creditors.   Exceptions were filed by the releasing and preferred creditors, and by Mr Okie, who also excepted to the former reports.   All the exceptions were dismissed, and the last report confirmed by the court.

Before the auditor it appeared that, in September 1837, John Knox and James Boggs respectively presented petitions to the Court of Common Pleas of Philadelphia for the benefit of the insolvent laws, and in October 1837, were discharged as insolvents, having first executed assignments as required by law.   Philip

---

* Said accounts were continuations of one another; in each the accountants commenced by charging themselves with the balance on the account immediately preceding.

[Okie's Appeal.]

Kelly and Hosea J. Levis, who were largely preferred creditors under the deed of assignment of May 1837, were appointed trustees, but never acted as such; nor did they appear or claim as insolvent trustees upon the settlement of the prior accounts. In May 1842, they were removed, and J. B. Okie appointed in their stead. After Mr Okie's appointment he filed a bill in equity in the Supreme Court of Nisi Prius against Mr Wilson, to March Term 1843, No. 1, praying that Mr Wilson might be decreed to account to him for the estate previously converted to cash and distributed, and to pay over the remaining assets and money, and all books and vouchers belonging to the estate. This bill was dismissed for want of jurisdiction. And on the 27th June 1843, the first business meeting at the audit since the fall of 1842, which in the mean time had been suspended to allow new books of account to be made out, Mr Okie appeared to assert his claims as trustee aforesaid.

On the 7th April 1842, James A. Knox was decreed a bankrupt by the United States District Court in Louisiana; and on the 5th April 1842, Mr Okie was appointed his assignee, and as such renewed his claim before the auditor. The releasing creditors gave in evidence, under objection, a letter of attorney, James A. Knox to John Knox, dated Nashville, June 2, 1837, authorizing him to join his copartners in an assignment of the estate of Knox, Boggs & Co. for the benefit of the creditors of the firm; this letter of attorney had not been recorded. Also letters alluding to the letter of attorney of James A. Knox, who was absent in some of the western states when the assignment was made, and had never since returned.

On the part of Mr Okie it was proved that the pew of James A. Knox in the Tenth Presbyterian Church, mentioned in the schedule of property conveyed by the assignment of May 1837, was transferable and valuable property, and that among the debts paid by the assignees, and allowed in their first account, were various sums paid to the individual creditors of James A. Knox; among others, $135 paid for a watch bought by him from Samuel Hildeburn on 11th April 1837. Mr Okie also gave in evidence a record of a suit in Missouri, to which the assignees became parties, 10th April 1838, and which resulted in a decree deciding the assignment to be invalid. It further appeared that with like object, to avoid the assignment, Wm. M'Kee issued an attachment sur execution from the District Court of the city of Philadelphia, on the 10th December 1838, on a judgment obtained against the assignors, in which the assignees were summoned as garnishees; and that divers other similar attachments were issued about March 1841, all of which were still pending.

The first error assigned on the part of J. B. Okie consisted in that the court did not award to him the several sums (or any part thereof) admitted and found to have been received by the assignee,

and alleged to have been paid to preferred and releasing creditors prior to the appointment of Mr Okie as trustee aforesaid.

2 and 3. Among the credits claimed and allowed in former accounts were $19,455 paid to or retained by William Wilson himself as preferred creditor, and $20,960 to Samuel Hildeburn, Thomas Kelly and William Wilson jointly as preferred creditors. The rejection of Mr Okie's claim to charge the accountant with these amounts formed the subject of the 2d and 3d errors on his part.

4 and 5. Among the credits claimed by Mr Wilson in the 6th account, filed Nov. 15th 1842, were $1629.85, errors made by the assignee against himself in accounts filed prior to 1841; and $4267.65, alleged errors in such accounts. As to the latter sum, Mr Wilson, in 1838, charged himself with the several sums composing it as so much money received by him from divers collecting agents in the west, principally from James A. Knox. The largest item, $2179, was charged in the assignee's books as to the proceeds, less discount of $2300, received in bills or notes on the 15th of Nov. 1838, from James A. Knox, and discounted for the assignee by J. W. Tilford. The only testimony produced to show that these several charges were errors was that of Mr Warrin, who testified that in examining the accounts in the winter of 1842, he could not find any corresponding credits claimed by J. A. Knox in the accounts furnished by him, and for that reason he believed the assignee had erroneously charged himself with said sums. He also testified, however, and it appeared by the assignee's books, that in 1837 and 1838 they had erroneously charged themselves and credited J. A. Knox's collecting account with divers sums, together over $1500, as received from him, which in fact had not been received from J. A. Knox, but were received by the assignees from other sources. And that like mistakes appear to have been made in the accounts of other agents. These mistakes were none of them discovered by Mr Warrin till the winter of 1842. J. W. Tilford was a broker, now residing in New York, a short time since in Philadelphia. The allowance as against Mr Okie of the credit claimed for these sums of $1629 and $4267, formed the subject matter of the 4th and 5th errors on his behalf.

6. While the 5th general account was before the auditor, Mr Warrin and Mr Morris were, at the instance of the releasing creditors, employed to make a new set of books, and for their services were paid $1135; the allowance of a credit for which was the basis of the 6th error.

7 and 8. In March 1844, the Supreme Court having decided the assignment of May 10th, 1837, to be void, (6 *Watts & Serg.* 310), Mr Okie addressed to Mr Wilson a letter dated March 5th 1844, demanding from him a surrender of all the estate and effects, books and papers, held by him under the assignment; which letter resulted in a correspondence, the last letter and demand from

[Okie's Appeal.]

Mr Okie being on the 17th April 1844, after his appointment as bankrupt assignee of James A. Knox. Mr Wilson thereupon availed himself of the professional services of Mr Binney and Mr Gilpin, in addition to that of Mr Meredith, who had previously been the counsel of the assignees, as appears by their accounts, and on the 4th of May 1844, he filed a bill of interpleader in the Supreme Court, in which he set forth that he had in his hands as assignee, or deposited in bank, a large sum of money, amounting to $16,059.88, the proceeds of the assigned estate, which he was willing to pay to whoever was entitled to it; and prayed an injunction against Mr Okie and the other counter claimants. On May 9th 1844, the court (Judge KENNEDY sitting as Judge) granted the injunction, directed an interpleader, and appointed C. T. Jones receiver. No security was required by the Court or entered into by the plaintiff before the injunction was granted. On July 24th 1844, Mr Wilson paid to Mr Jones, as receiver, $11,138.88, and gave to him checks on the Western Bank for $3740.92, which the bank refused to pay.

The assignee had kept a general account as assignee in the bank, and on March 5th 1841, three attachments *sur judgments* against Knox, Boggs & Co. were issued, and the bank made garnishee. At this time there was in bank $7251.01, of which Mr Wilson drew $3982.82 on March 7th, leaving $3268.19 in bank, being a balance arising from the general account of moneys received on and after December 19th 1840. The money now in hands of accountant included $5456.22, formerly awarded to preferred or releasing creditors, but not paid over, of which $817.42 was awarded to Thomas Sheepshanks, a preferred creditor, on May 1st 1841. No particular fund was set apart to make these payments, nor was there any specific deposit in bank to their credit.

A written agreement between Wm. Wilson and J. B. Okie was given in evidence before the auditor, dated October 16th 1844, by which it was agreed, *inter alia*, that the balance arising from the accounts before the auditor, and the remaining assets and effects of the estate, if ultimately decreed to be paid to J. B. Okie, should remain in his hands, subject to the extent they then were to the several attachments laid in the hands of the said Wilson, severally, or jointly with any co-garnishee; and that the pendency of said attachments should not be interposed as an objection to a decree being made, nor to the payment of said Okie of the money that might be awarded to him.

The auditor allowed the credits for costs and counsel fees about the bill of interpleader, &c., and also commissions of Mr Jones as receiver, and decreed that of the money awarded to Mr Okie, $3740.92 should be paid in checks on the Western Bank for moneys attached therein. Exceptions to which formed the subject of the 7th and 8th errors.

Errors assigned by J. B. Okie, trustee, &c. : —

1. The court erred in not awarding to J. B. Okie, trustee, &c., the several sums, or any part thereof, admitted and found to have been received by the assignees, or the surviving assignee, and alleged to have been paid to preferred or releasing creditors prior to the appointment of Mr Okie as trustee; and in confirming the auditor's report on the 1st, 2d, 3d and 4th accounts, as respects these sums, and dismissing the exceptions thereto.

2. In not charging accountant and awarding to exceptant the amount of $19,455, or any part thereof, with interest, being the amount retained by Mr Wilson as a preferred creditor out of the moneys received by him under the assignment, and for which he has claimed a credit in the 1st and 2d accounts.

3. In not charging accountant and awarding to J. B. Okie the sum of $20,960, with interest, being so much paid by accountant on account of a preference in the assignment in favour of himself, jointly with Thomas Kelly and Samuel Hildeburn.

4. In allowing to accountant, as against the said J. B. Okie, a credit for $1629.85, claimed in the 6th account for errors made in the 1st account, and also $4267.65 for alleged errors in said 1st account.

5. In finding, on the testimony given before the auditor, that the accountant had erroneously charged himself with the said sum of $4267.65 in the first account.

6. In allowing to accountant, as against the said J. B. Okie, credit for the sums of $235 and $900, paid to W. H. Morris and James Warrin for services done for the releasing creditors.

7. In allowing to accountant the sum of $200 paid to Mr Binney, and $100 paid to Mr Gilpin; also, in allowing to Mr C. T. Jones, out of the funds payable to J. B. Okie, the sum of $300 for commissions, and to Mr Wilson the costs and charges about the interpleader.

8. In awarding that $3740.92, part of the money awarded to J. B. Okie, should be paid to him by checks for funds said to be under attachment in the Western Bank.

Errors assigned by releasing creditors : —

1. The court erred in awarding the undistributed funds to J. B. Okie.

2. In not awarding the said funds to be distributed among the creditors, according to the assignment of 10th May 1837.

3. In not distributing so much of said funds as resulted from the assets of Knox & Boggs among the creditors, agreeably to said assignment.

Error assigned by Thomas Sheepshanks : —

The court erred in not allowing to him the claim awarded to him in the previous report of the auditor, and admitted by the assignee to be in his hands.

[Okie's Appeal.]

The following was the report of the auditor : —

The assignment under which the present accounts were filed was made on the 10th May 1837, to William Wilson and David Knox, who accepted the trust; they filed two accounts, which were audited and confirmed; afterwards David Knox died, and Mr Wilson filed his first and second accounts as surviving assignee, being the third and fourth general accounts; which were also audited and confirmed. In these four accounts full payments were made, or awarded to be made, to the preferred creditors, and two dividends to the releasing creditors. In this place your auditor, at the request of one of the parties before him, reports the following facts as existing before and after the assignment.

On February 15th 1825, John Knox and James Boggs, two of the assignors, commenced business under the firm of Knox & Boggs, and continued in partnership until July 24th 1828, when David Knox was taken into the new firm of Knox, Boggs & Co., and remained until April 12th 1831, when he retired without any settlement of the firm affairs, but receiving for his interest from the remaining parties $2000 or $3000, and the old firm of Knox & Boggs was resumed, and continued until January 13th 1836, when James A. Knox and George Griffin Welles were introduced into the new firm of Knox, Boggs & Co. On April 21st 1836, G. G. Welles retired; and without any other alteration, the firm of Knox, Boggs & Co. remained till it expired by its insolvency. The new concerns were not formations of new partnerships, but continuances of the old ones, taking their assets and assuming their liabilities. John Knox, James Boggs and David Knox, while in partnership, were entitled to equal shares of the profits. When G. G. Welles and James A. Knox were taken into partnership, they were each to receive one-tenth of the profits; the remaining eight-tenths being equally divided between John Knox and James Boggs. On Welles retiring, J. A. Knox's interest remained one-tenth of the profits of the business. No capital was put into the business by either or any of the partners. John Knox and James Boggs married daughters of Thomas Kelly. David Knox was brother of John Knox, and James A. Knox was a cousin of John and David Knox, and brought up by John Knox from his infancy. Immediately after the assignment, the assignees executed a power of attorney, dated May 12th 1837, empowering John Knox, James Boggs, and James A. Knox, jointly and severally to act for them in the fulfilment of their trusts; and this instrument was duly acknowledged and recorded. The three attorneys acted under it in the collection and disbursement of the assets of the estate, and in the general transaction of its business, until the death of John Knox, in the year 1841, when the surviving attorneys continued to act as usual. At the September Term of this court, in the year 1837, John Knox and James Boggs were discharged as insolvent debtors. Thos. Kelly and H. J. Levis were named as

their trustees, but never acted; and on May 28th 1842, J. B. Okie was appointed trustee in their place, and gave the required security.    James A. Knox was, in the year 1842, discharged as a bankrupt by the U. S. District Court of Louisiana; and on the 5th April 1844, J. B. Okie was by that court appointed his assignee.

Pursuant to public notice, your auditor held his first meeting to audit the fifth general account on the 4th February 1842, and at sundry other times, by adjournment, when he was attended by W. M. Meredith, Esq., for the assignee, by E. K. Price, Esq., for certain of the releasing creditors, and by some of the said creditors in person.    The account was examined and vouched, and no objections were made to any part of it.    But before the audit on this account was closed, some of the creditors present expressed a wish for a thorough examination of the affairs of the estate, which was acquiesced in on behalf of Mr Wilson; and it was accordingly agreed that James Warrin, who had been book-keeper to Knox, Boggs & Co., before their insolvency, and subsequently kept the books of the estate for the assignees, should make a complete set of books, showing all the affairs of the estate, and that William H. Morris, an accountant, should examine the books and accounts on behalf of the creditors; that the audit should in the mean time be suspended, and that the balance in hand, as well as the moneys received since the filing of this account, should be rateably divided among the releasing creditors, who had, on the former audits, made proofs of their claims.    Mr Okie was not present at any of these meetings, all these arrangements having taken place before his appointment as trustee or assignee, and no person having up to this period appeared before the auditor, either to contest the assignment or the claims of those claiming under it. Accordingly Mr Wilson, as surviving assignee, declared a dividend of 8 per cent. to the releasing creditors, and paid it to them with one or two exceptions; he then filed his fourth account as surviving assignee, or the sixth general account, in which, among other things, he claimed credit for the payment of this last dividend to and among the releasing creditors, and also certain credits for errors, omissions, and overcharges in former accounts.

This account was filed on the 16th November 1842, and was referred to the same auditor, who, after due notice, held his first meeting thereon on the 24th January 1843, when he was attended by the same parties who had previously attended before him. The account was vouched, but the general examination by the creditors not being completed, nothing else was done, and after a few abortive meetings, the audit was suspended until June 27th 1843, when the auditor, in addition to the parties heretofore represented, was attended by Messrs C. & J. Fallon, as counsel for Mr Okie, trustee and assignee as aforesaid, or, more correctly speaking, in the first instance, as trustee only, Mr Okie not being at

[Okie's Appeal.]

that time the assignee in bankruptcy, but subsequently appointed : they claimed for the trustee the whole fund received by Mr Wilson, the assignee, without regard to the claims of the preferred creditors, on the ground that the assignment was invalid, and offered evidence to prove its invalidity ; they also, without waiving any rights or admitting the validity of the assignment, asked that the accounts before the auditor should be vouched. Subsequently, to wit, on the 18th April 1844, they renewed this claim for Mr Okie as assignee in bankruptcy of James A. Knox. After the accounts had been examined, and many objections made, which will be hereinafter considered, the counsel of Mr Okie required the releasing creditors to make proof of their claims; they accordingly made the proofs. All these creditors executed the release to the members of the firms of Knox, Boggs & Co., and of Knox & Boggs, as called for in the assignment, and the release was given in evidence, executed also by John Peterson, who never on any occasion appears to have made or proved any claim, or received any dividend. The taking of the proofs of these claims occupied several meetings, and after many of them had been proved, the auditor held a meeting on the 23d May 1844, when he was attended by Mr Price and Messrs Fallon, and also by Charles Gilpin, Esq., who stated that he appeared by directions of Charles Thomson Jones, a receiver appointed by the Hon. John Kennedy, a judge of the Supreme Court of Pennsylvania, sitting at Nisi Prius, under an injunction issued by him on a bill of interpleader filed by Mr Wilson, and to which he referred the auditor. The counsel for Mr Okie, in reply, objected that the injunction expressly restrained proceedings at law, and contended that the audit of the accounts was not a proceeding at law, but in equity, and could not be enjoined; and insisted that Mr Wilson should go through with the matters of account he had voluntarily commenced. At the next meeting, Mr Gilpin stated that he had no further instructions from Mr Jones, and now, on behalf of Mr Wilson, gave in evidence, under objection from Messrs Fallon, the record of the bill of interpleader, &c., in the Supreme Court, to March Term 1844, No. 3, in equity, exhibited by William Wilson as plaintiff against the following defendants, viz: Thomas Sheepshanks, G. & W. S. Gray, and William Railey, preferred creditors, to whom dividends had been awarded on former audits, but who had not as yet received them, all the releasing creditors, and Thomas Kelly, the holder by transfer of many of their claims, J. B. Okie as trustee and assignee, and William M'Kee & Co., James Hennessy & Co., J. B. Okie and his *cestui que use*, J. B. M'Mullin and Maberry, Giller and Watkin, non-releasing creditors, who had issued attachments of execution and summoned Mr Wilson as garnishee. The bill was filed on May 6th 1844, and after setting forth the assignment and actings under it, states that the complainant had in his hands cash and unadministered assets;

that the preferred and releasing creditors require him to pay them the cash, and collect the outstanding assets, while Mr Okie, as assignee and trustee, and the attaching creditors forbid him to do so, but claim the same for themselves, treating the assignment as a nullity; that the trustee and assignee had also commenced two suits against him. He avers his readiness to pay over the moneys, &c., or pay them into court, and prays for a receiver, and that the antagonist claimants interplead, that their rights may be determined and he protected; and he further prays for an injunction to restrain adverse proceedings against him.

To this bill J. B. Okie, as trustee and assignee, demurred specially as to part, pleaded as to part, and made answer as to the residue; and the case having been argued on the bill and answer, &c., and on a motion for the appointment of a receiver, the judge on the 20th May 1844, made a decree appointing Mr Jones receiver, according to the prayer of the bill, ordering the antagonist claimants to interplead under future orders of the court, enjoining the attaching creditors and insolvent trustee and bankrupt assignee from prosecuting the actions at law mentioned in the bill, or any other action against the plaintiff in respect of the said cash and assets, until further order, and enjoining the preferred and releasing creditors from pursuing complainant at law to compel him to account to them for the cash or assets or any other proceedings at law. On 27th May, Mr Okie appealed from this decree to the court in banc. At a subsequent meeting, Mr Fallon gave in evidence the record of the case of *Hennessy* v. *The Western Bank*, and referred to the opinion of the Supreme Court in that case, reported in 6 *Watts & Serg*. 300, as fully establishing the invalidity of the assignment. He also gave in evidence an exemplified record of a suit in St. Louis brought by George Brown, *et al.*, citizens of Maryland, on 19th December 1837, against Knox, Boggs & Co., wherein several debtors to the late firm were summoned as garnishees. On the 10th April, 1838, Messrs William Wilson and David Knox interpleaded and claimed the debts attached as passing to them under the assignment of 10th May, 1837. On the same day plaintiffs denied the interpleader and joined issue. On the 8th May 1838, the court made an order of publication with a view of notifying the defendants, all of whom lived out of the State of Missouri. On 9th July 1838, answers were filed by the garnishees, admitting their indebtedness to Knox, Boggs & Co. at the time of the assignment, and that notice of it had been given by the assignees. The plaintiff denied these answers, averred that the assignment was fraudulent, and joined issue. On these pleadings the court on 19th January 1839, entered judgment for the claimants William Wilson and David Knox, and the plaintiff moved for a new trial, assigning for reasons: 1st, that the verdict was against law; 2d, against evidence; 3d, against the weight of evidence; and 4th, because the deed of assignment

given in evidence by the interpleader is fraudulent and void as to plaintiff; but the court overruled this motion and sealed a bill of exceptions.

The bill of exceptions embodies copies of the assignment, schedules and release, and of a power of attorney from James A. Knox in Tennessee to John Knox, authorizing him to join in any deed of assignment of partnership estate, and ratifying any such assignment if previously made : it bore date 2d June 1837, and was received in Philadelphia on the 13th day of that month, having been acknowledged before a Notary Public in Tennessee. Depositions in support of the interpleader were taken in Philadelphia, and read on the trial, to show the validity of the assignment by the laws of Pennsylvania. On 23d April 1839, judgment was entered against defendants for $20,192.51 ; and on 25th May 1840, the Supreme Court for the Third Judicial Circuit of Missouri reversed the judgment of the court below, given on 19th January 1839, and the opinion is set forth deciding the assignment to be invalid, principally because it stipulated for a release to the assignors, which the court in this case held could not be done in Missouri, whatever might be the decisions or practice in other states : the court appeared also to think that the want of a list of amounts due to creditors in the schedule formed, in connection with other circumstances, an objection to the assignment; and a majority of the court thought that proof of the genuineness of the claims under the assignment should have been given, and the case was accordingly remanded to the court below for further proceedings.

As respects the bill of interpleader, the judge at Nisi Prius appointed Charles T. Jones, Esq., receiver, and he gave security approved by the court; after his appointment Mr Wilson paid over to him the moneys in his hands, but subsequently an agreement was entered into between Messrs Wilson and Okie, whereupon the interpleader was withdrawn, the moneys paid back by Mr Jones to Mr Wilson, and a fifth account filed by Mr Wilson as surviving assignee (being the seventh general account of the estate); it was also referred to the undersigned; and he was attended by the parties and counsel who had previously attended, and also by H. Chester, Esq., for Brown, Hanson & Co., non-releasing creditors, and F. E. Brewster, Esq. for Maberry, Giller and Watkin, non-releasing and attaching creditors, who claimed payment from the funds in hand and proved their claims : that of Brown, Hanson & Co. being on a judgment obtained 26th January 1839, for $2,188.17, in the District Court for the city and county of Philadelphia, to December Term 1838, No. 730, and that of Maberry, Giller and Watkin being on a judgment in the same court, to September Term 1837, No. 1145, for $879.59, obtained 27th December 1837, on which an attachment *sur* judgment was issued to June Term 1844, No. 2, and the Western Bank summoned as garnishee. William Smith, Esq. appeared for York &

Sheepshanks and Thomas Sheepshanks preferred and releasing creditors, and claimed the amounts heretofore awarded but not paid to them, and any future dividends for York & Sheepshanks as releasing creditors.

The last account was examined and vouched, and the parties respectively gave evidence to sustain or to invalidate the assignment; but without noticing in detail the various objections to the testimony, it is sufficient here to state that all testimony as offered by or on behalf of the assignee under the assignment or the releasing creditors, was objected to by Mr Okie, and received under his protest, while the same course was pursued by the other side as to all evidence offered by him, these objections being made as well to all the evidence hereinbefore stated, as to that hereinafter to be set forth.

To sustain the assignment, James Warrin, the book-keeper of Knox, Boggs & Co., was examined, and he testified that he had every reason to believe James A. Knox had no individual property at the time of the assignment; that he had known him for twelve years, first, as a boy in the store of Knox & Boggs, sweeping it, lighting the fire, carrying out parcels, &c.; that he was then entirely without means, and when taken into the firm, he put in no capital. On cross-examination, he said that at the time of the assignment James A. Knox was travelling, but lived in John Knox's family, and has not since returned; that he travelled on behalf of the estate till the end of 1841 or beginning of 1842; that he started but a few weeks before the assignment; that witness saw him the night before he went, he taking only a trunk of clothes, and not expecting to be long absent. In answer to a question from Mr Fallon, whether it was not possible that James A. Knox might have acquired individual property otherwise than through the firm, without the knowledge of the witness, he stated that he had no knowledge of any source from which James A. Knox could have derived any money, and therefore could not answer the question but by saying he knew nothing about it; that it was possible property might have been given to him without the witness's knowledge; that he knew nothing of his owning a horse and sulkey, but that his accounts showed that while travelling he bought a horse for the estate, and charged it to the estate, and afterwards sold it and credited the proceeds to the estate. On re-examination, he stated that for the first three or four years James A. Knox drew nothing from the firm, John Knox supplying him with board, lodging, clothing and pocket-money: that the first salary he drew was about the fifth year, and was $100, and as he grew bigger his services were more valuable: that if he had bought separate property, or it had been given to him, it would have been likely to have been known by the witness, who enjoyed his confidence.

The release was also given in evidence executed by the releasing

[Okie's Appeal.]

creditors, to John Knox, James Boggs and James A. Knox; also three letters from James A. Knox; and these letters with the power of attorney from James A. Knox to John Knox, and that from the assignees hereinbefore mentioned, were relied on to sustain the assignment. Mr Okie gave in evidence certain correspondence between him and Mr Wilson; also an account from the assignee's ledger, being of James A. Knox's personal debts, and proved that the second item thereof, $135, was paid by the assignee to Samuel Hildeburn on 5th October 1837, being for a gold watch and key bought by James A. Knox on 11th April 1837, and that the receipt specified the payment to be in full for a bill due by James A. Knox. He also gave in evidence all the previous accounts filed by the assignee and audited. The schedule annexed to the assignment showed that James A. Knox owned a pew in the Tenth Presbyterian Church, and a witness was called who testified to the form of the deed for the pews of that church, and gave a deed in evidence: the witness stated that these transfers are subject to the approval of the trustees of the church, and that pews in the aisle of the church where James A. Knox's was, were worth from $400 to $600 each. The constitution and by-laws of the church were given in evidence.

Under the assignment the releasing creditors claimed all the funds in hand, while Mr Okie, contending that it was void, claimed all such funds, and as much more as should be disallowed the accountant in settlement. The auditor, considering himself bound by the decision of the Supreme Court in the case of *Hennessy* v. *The Western Bank*, decides in accordance therewith, that the assignment is invalid, and awards to J. B. Okie all the funds he may find in hand, and that the same be paid to the said J. B. Okie, in his character and capacity of trustee under said proceedings in insolvency; and the only remaining question is as to the amount so to be paid by the assignee.

1. The cash balance of the seventh account is $10,277.66, all of which was claimed by Mr Okie; the accountant, however, claimed a credit therefrom of $500, commissions of Mr Jones, the receiver; this claim was objected to by Mr Okie, not only as excessive, but because Mr Okie should not pay them. When Mr Jones was appointed, he gave security in the sum of $50,000, received from Mr Wilson over $11,000 in cash, which he deposited in bank in a separate account as receiver, received checks and uncurrent funds, which he kept separate, and notified all the debtors of the estate to make payments to him; under these circumstances the auditor allows $300 for his compensation, which leaves of this balance $9,977.66 in cash to be paid to the trustee.

2. In the same account the sums paid as fees to Messrs Gilpin and Binney, and for costs of interpleader, amounting to $343.75, were objected to, but are allowed as proper expenses in the peculiar position of Mr Wilson.

[Okie's Appeal.]

3. There is a note to the statement of unadministered assets accompanying said account, showing also in the hands of Mr Wilson the sum of $5456.22, being the amounts awarded to certain preferred and releasing creditors, but not paid over; and this sum is made up as follows, viz:—

| | |
|---|---:|
| Deposits attached in the Western Bank, - - | $3740.92 |
| Cash, - - - - - - - - | 795.30 |
| United States Bank notes, - - - - | 900.00 |
| Florida notes, - - - - - - | 20.00 |
| | $5456.22 |

The assignee will make payment of these sums by handing over to the trustee the cash, the United States Bank notes, and the Florida notes, and by giving checks on the Western Bank for the funds therein.

4. The commissions in the last account are disallowed by agreement, the amount whereof, $513.37, is to be paid to the trustee.

5. The trustee desired the auditor to charge the accountant with all former payments to creditors under the assignment, which the auditor refuses to do.

6. He claimed to charge the accountant with sums heretofore paid to or retained by himself in former settlements as a preferred creditor, which sums, amounting to $19,455.00, he claimed, with interest thereon; the auditor refuses to accede to this request, as the claim has long since been judicially settled and passed upon by the audit, and subsequent confirmation.

7. He claimed to charge him with $20,960 and interest, being a credit in former accounts, for payment of a preference to Samuel Hildeburn, Thomas Kelly and the accountant, being on their joint note; this claim is rejected for the reason last stated.

8. In the sixth account, the credits claimed of $235, paid William H. Morris for services to releasing creditors, and $900 paid James Warrin for making a set of books for them and at their request, were objected to, but are allowed, being on the footing of so much moneys paid to or on account of the releasing creditors themselves.

9. In the same account, the following credits, claimed for errors in former accounts, were objected to, viz:—

| | | | | | |
|---|---|---|---|---|---:|
| 1837, May 11. | Erroneous credit to | | J. R. Brown, | | $100.00 |
| "  July 17. | do. | do. | Grondyke & Coffin, | | 100.00 |
| 1838, Sep. 18. | do. | do. | Mdze., - - - | | 305.84 |
| "  "  " | do. | do. | do. - - | | 725.72 |
| "  " 28. | do. | do. | do. - - - | | 50.97 |
| "  "  " | do. | do. | do. - - | | 29.32 |
| | | | | | $1311.85 |

And the credit claimed for interest on this sum of
$1311.85, to November 1842, being a proportion-
able part of the interest claimed on $5272.65,                318.00
                                                          ─────────
                                                          $1629.85

These errors were manifest, but the only objection made was
to their allowance as against Mr Okie; but the auditor deems the
credits rightfully claimed.

10. In the same account the following credits claimed were
objected to for the same reason; and it was also denied that they
were errors, viz:—

1838, Nov. 15. Erroneous credit in James A. Knox's
                  collections, $2300 (part of $4000),
                  less discount, $120.17,   -   -   -   -   $2179.83
1839, June 19. do. do. in do. $500, less dis. $11.25,         488.75
  "     Sep. 27. do. do. in do.   -   -   -   -   -   -   -    600.00
1841, Mar. 20. do. do. Jas. M'Garvey, in am't $665.16,        166.07
                                                          ─────────
                                                          $3434.65
              Credit for interest on do.,   -   -   -       833.00
                                                          ─────────
                                                          $4267.65

Mr Warrin was examined to sustain these credits, and testified
as follows:—" I found, in preparing this statement, Abstract No.
2, to correspond with James A. Knox's collection account for 1838,
that the assignees, in November 1838, had credited proceeds of
one post note of the Planters' Bank for $1500; one of the Union
Bank for $900; and two others of the same bank for $800 each;
making in all $4000; which appear to have been sold to J. W.
Tilford (as appears by the cash-book), who charged for commis-
sion and exchange $209; leaving the net sum of $3791, which
the assignee credited the estate in his first account under that
date; and that the $1500 draft and one of the $800 drafts so cre-
dited were not required to complete or reconcile James A. Knox's
account. The difference, $120.17, I deducted as its proportionate
part of the exchange and commissions; but I found that the as-
signees had not credited $1400, which James A. Knox claimed
by said account, and I introduced them in this account, as of 1839,
which made the cash agree and his accounts also. The $488.75
arises from a similar excess of credit given by the assignees on
June 19th 1839, $500 less $11.25 discount; and the $600 of Sep-
tember 27th 1839, is precisely the same; but in the same account
there is a charge." On cross-examination by Mr Fallon he said:
" I take from the cash-book these remittances of $1500 and $800.
[Mr Fallon then called for a copy of the page or pages of the
cash-book of the entries of all these sums for which the credits
are claimed as errors in James A. Knox's collections, and the
same was afterwards furnished by Mr Warrin.] The cross-

examination being continued, the witness proceeded as follows: "I have before me James A. Knox's collecting accounts; this abstract No. 2, containing all credits for remittances claimed to be made by him in 1838; the same as to abstract No. 3, which is for 1839. All I know about these remittances is contained in these abstracts and the cash-book, and by which I have balanced all his accounts. The reason I believe these remittances of $1500 and $800 were not made, is because they are not contained in James A. Knox's account, of which No. 2 is an abstract; also, that from the perusal of his letters to the assignees, I do not find any credits claimed beyond what he has received." [Mr Fallon objects to all after the word "also."] "The $1400 I have spoken of is no part of the $2179.83 claimed as an error under date Nov. 15, it being two drafts of $700 each, appearing to have been remitted by James A. Knox, and not before credited. The only knowledge I have of the item of $488.75 and $600 is precisely from the same sources, viz: the entries, a copy of which I gave you, and James A. Knox's account of remittances, which does not appear therein, as per abstract No. 3, for 1839."

Mr Warrin had previously testified that the charges and credits of the assignee's collecting agents had been by him tested, tried and proved with their accounts, and balanced to a cent; that in former accounts the assignees charged themselves with all the moneys received from James A. Knox, and stated on the account the names of the persons from whom the collections had been made, but took no credits for travelling expenses or other items embraced in the sixth account, and the reason was that they had not the accounts with them; he afterwards testified on the subject of the $166.07 (the M'Garvey item), that it arose from his having, by direction of one of the agents of the assignee, set down this item as received, when it had already been previously credited to the estate; and he stated generally that he had discovered and corrected all the errors on both sides of this account when he came to make the set of books for the releasing creditors in the fall of 1842; that he had no reason to believe the assignees did not receive the several sums originally charged as received from James A. Knox, except that they are not contained in any of the accounts he rendered; that Tilford was a broker, who then lived here, but now in New York, and had been here lately. The auditor, on this testimony, considers these items as sufficiently established, and allows them.

11. The credit for S. P. Walker's draft, now claimed, was objected to, but is allowed: it was a preferred debt under the assignment, being Walker's draft on Knox, Boggs & Co., by them accepted, and payable to the order of Robert Steen, protested for nonpayment, and, after John Knox's death, found with his other papers and vouchers as attorney for the estate, with the indorsement of Steen.

Whereupon, after deduction of the auditor's fee and expenses, and of a counsel fee to Mr Gilpin for services as counsel for the assignee in attending the audit, the auditor awards payment to be made to J. B. Okie, trustee, &c., as follows, viz:—

| | | | |
|---|---|---|---|
| Balance of last account, | - - | - $10,277.67 | |
| Less Jones's commissions, | $300 | | |
| Counsel fee at audit, | 100 | | |
| Auditor's fee and expenses, | 263 | 663.00 | |
| | | | $9,614.66 |
| Amounts in hand of former awards to preferred and releasing creditors not paid over to them, | | - - | 5,456.22 |
| Disallowed commissions in last account, - | | - - | 513.27 |
| Sum total payable to J. B. Okie, trustee, - | | | - $15,584.15 |

Of which $900 will be paid in notes of the U. S. Bank, $20 in Florida notes, $3,740.92 by checks for funds under attachment in the Western Bank, and the residue in cash.

N. B.—Under the foregoing decision the outstanding debts and other unadministered assets of the estate are to be transferred to said J. B. Okie, trustee, &c.

Supplemental report:—

The auditor appointed to audit, settle and adjust the 5th, 6th and 7th accounts of the assignee of the estates of Knox & Boggs, and of Knox, Boggs & Co., and to report distribution, &c., having lately filed his report, has been since requested by the parties interested to report certain testimony in the case that he had omitted in his report, or had not, as was thought, stated sufficiently at length, and he herewith returns the same in this his supplemental report.

1. He herewith annexes a copy of the power of attorney from James A. Knox to John Knox, the original of which was given in evidence in support of the assignment.

2. He herewith annexes copies of the receipts of Messrs. Gilpin and Binney for fees, and states that no evidence on the subject of said fees was given beyond the contents of said receipts exhibited as vouchers.

3. The two items of $22.50 and $21.25 in the last account are for costs in and about the bill of interpleader, the first being for costs paid to the sheriff, the second for a copy of the record in that case.

4. He stated in said report, that on the injunction being granted, and Mr Jones becoming the receiver, Mr Wilson paid over to him the moneys in his hands; he now reports, in addition, that said payment took place on the 24th July 1844, and was made in the following manner, viz:—

[Okie's Appeal.]

| | |
|---|---:|
| Checks on the Western Bank, - - - | $3740.92 |
| Henry Ewing's draft, due Aug. 17, 1844, | 500.00 |
| Cash, - - - - - - - | 11,138.88 |
| United States Bank paper, - - - | 900.00 |
| Florida Bank notes, - - - - | 20.00 |
| | $16,299.80 |

Mr Jones, who was examined, testified that he presented the checks at the Western Bank, and that the bank refused to pay them; that one check was for $472.73, and was drawn on said bank by James Boggs, attorney for William Wilson; the other for $3268.19, drawn by Mr Wilson himself; that he tried to collect them, but without success.

5. Mr Jones also testified that after his appointment as receiver, he was notified by one of the Messrs Fallon that Mr Okie denied his authority to act, and would not be responsible for any expenses.

6. Mr Warrin's testimony has been stated on the subject of errors, &c.; he also testified that credits had been given to James A. Knox's collecting account which belonged to other collections, and referred to the assignee's ledger; that the several credits before which the name of "D. J. Cochran's collections" is written *in red ink*, were moneys collected by him, said Cochran, and credited by mistake to James A. Knox; the charge on the other side of the account, dated December 30, 1837, $13,888.41, is inserted for the purpose of balancing those erroneous credits to J. A. Knox, and agreeing with an entry made of Cochran's collections. That there were several similar errors of credits given to J. A. Knox's accounts for moneys collected by James Boggs, and which were corrected by a similar debit to J. A. Knox's account. And that it was when Mr Warrin made those books, in 1842, that he discovered these errors. He also gave various explanations in regard to corrections made by him, reconciling the collecting accounts of J. A. Knox, and respecting certain items of debit and credit in the assignee's account, and showing that they resulted in a benefit to the estate.

The case was argued by

*Fallon* and *Dallas*, for Okie.

*Price, Meredith* and *Sergeant*, for Wilson and the releasing creditors.

The opinion of the Court was delivered by

SERGEANT, J.—It appears that the accountant, William Wilson, became assignee with another person under a voluntary assignment made by Knox, Boggs & Co. in May 1837, and having accepted the trust, they went on and received large sums of money

P *

belonging to the estate, and disposed of property, and paid the creditors under the assignment. They filed accounts of receipts and payments of the bulk of the estate in March 1839, and June 1840. By the death of the other assignee Wilson became sole assignee, and continued the execution of the trust in the same manner. In October 1840, he filed a third account, and in February 1841, a fourth. All these accounts were audited, and the moneys distributed among the creditors by decree of the court. In December 1841, Wilson filed a fifth account; and whilst this was before an auditor, in November 1842, he filed a sixth account; and in November 1844, a seventh and final account. All these accounts were between the assignees and the respective preferred or releasing creditors claiming under the assignment. Mr Okie was not present at any of the meetings; nor did any person contest the assignment, or the claims of the creditors under it, till the 27th June 1843, when Mr Okie appeared before the auditor, claiming the whole fund received by the assignee, Wilson, without regard to the claims of creditors, on the ground that the assignment was null and void. It further appears that, in October 1837, John Knox and James Boggs were discharged as insolvents by the Court of Common Pleas of Philadelphia county, having first executed assignments to Philip Kelly and Hosea J. Levis; they, however, never acted and never appeared as claimants on any occasion. In May 1842, they were removed, and Mr Okie was appointed in their stead.

The present case is an appeal from the decree of the court below confirming the report of an auditor appointed by that court to audit, settle and adjust the 5th, 6th and 7th accounts before mentioned. The auditor decided, on the authority of *Hennessy* v. *The Western Bank*, (6 *Watts & Serg.* 300), that the assignment was invalid. He refused to charge the accountant, as was desired by Mr Okie, with all former payments to creditors under the assignment, or retained by himself as a preferred creditor individually or jointly with others; but awarded to Mr Okie all the funds in the hands of the accountant, consisting of the balance of the last account, $10,277.67 and $5456.22, amounts in former accounts awarded to preferred and releasing creditors, but not paid over by the accountant, and disallowed commissions, $513.27—total $15,584.15—to be paid to Mr Okie, in his character of trustee under the proceedings in insolvency, subject to deductions for charges and expenses.

It thus appears that this case, which was originally merely an account between an assignee under a voluntary assignment and his *cestuis que trust*, filed by the assignee, and referred to an auditor to audit, settle and adjust, that is to say, to ascertain the correctness of the debts and credits, and strike a balance, under the trust and as between the assignee and the *cestui que trusts* solely, was turned into the trial and determination of an issue between

[Okie's Appeal.]

Mr Okie, the assignee under the insolvent act, asserting the trust to be a nullity, and Mr Wilson, the voluntary assignee. In going into this question it seems to us plain that the auditor exceeded his authority, and undertook to try and determine questions not submitted to him. His duty was limited to the auditing and adjusting the accounts between Mr Wilson, the assignee in trust, of the one part, and the claimants under that trust, of the other part. Now, Mr Okie is not one of these. He does not claim under the trust, nor is in any wise interested in it: on the contrary, he comes to overthrow it entirely, and set it aside. He may have a right to do so, but this is not the mode in which he can assert that right. Nor had the court jurisdiction in this proceeding to make a decree affecting his rights, or those of third persons not comprised within the trust, but claiming in opposition to it; nor would even consent give jurisdiction. This is a proceeding between other parties, and for a different purpose. On the one hand, the creditors under the trust have been paid or claim their debts; on the other, the accountant claims credit; and the litigation is between them alone. The accountant might originally have renounced the trust, and thereby got rid of it; but having accepted it, and proceeded in the execution, sold the assets, and received the proceeds, he was bound to pay those assets over according to the trust, or show some legal reason for not doing so. But that was entirely his own concern; and he has actually paid over the much larger part according to the trust. He is, of course, bound by that payment, and it is too late for him to question its propriety. Nor does he, but asks a credit for them. And why should he not receive such credit in the settlement of his accounts with the creditors? That he may be ultimately responsible to others for so doing, is no reason, that I can perceive, why he should not have this credit, nor why he should not have his accounts with his *cestui que trusts* settled. If Mr Okie, or any other person, has a claim against the accountant for the sums he has received at any time, they must assert it by adversary process, and then the question will fairly arise between the proper parties, and disputed facts can be tried by jury in the usual manner, and it can be legally ascertained how far this assignment was void under the statute 13 Eliz.; and as to what description of creditors; and what steps they were bound to take to avail themselves of their rights; and how far the general creditors under the insolvent law are now precluded by laches, neglect or acquiescence, from coming forward, after lying by without proceeding against the property or the accountant, and suffering him to go on and execute the trust, make titles to property, receive and pay over large sums of money under and in pursuance of the trust without notice, claim, suit, judgment execution, or otherwise. All these are very grave questions, of immense moment to the parties concerned, and not to be thrust into a proceeding between parties litigating mat-

[Okie's Appeal.]

ters amongst themselves with which these questions have no concern, and where the mode of trial and course of proceeding are different; and the object in view by the Legislature in giving the Court of Common Pleas a summary, equitable, special jurisdiction, was simply to settle the accounts between the trustee and the *cestui que trusts*, and not to try all these questions, foreign to the subject of the accounts, and in derogation of the trust. It was for this reason, no doubt, that, by the Act of 14th April 1836, sec. 19, it is only a co-trustee or co-assignee, or person interested in the trust estate or fund, that can issue a citation. Besides, we should hesitate to say that an assignee under a voluntary assignment, duly recorded, who has entered on the trust and given security to perform its duties, after selling the estate and collecting the assets, is then, without adversary suit or process against him, to come to a dead pause, and refuse to distribute them under the trust, because possibly, at some distant day, it might be made to appear that there was some flaw or defect in the assignment; and that he cannot be permitted to file his accounts for settlement, or be cited to file them, nor distribute them according to the trust. And if he cannot take this ground, it follows that he must proceed in the discharge of the duties he has undertaken, subject to all the requisitions of the law, until he is checked or stopped by some adversary process, and then he must abide the legal results of that process, whatever they may be. But that is a matter in which third persons are concerned, and is between him personally and them; whereas the matter of the accounts between him and his *cestui que trusts* remains the same, with all the liabilities and duties of the trustee and *cestui que trusts* under the law, to file and settle them between themselves.

So far, then, as regards the money already paid over by Mr Wilson under the trust, or retained by him for his own debts, he is to receive a credit for it, as it does not appear that there is any appeal or exception, on the part of the accountant or the creditors under the assignment, in regard to it.

So far as respects the money in hand, and not paid over, it will be for the accountant either to pay and ask credit, or to object to payment under the trust, and claim to pay it to others, or hold it as stakeholder, to respond to adverse claims that may exist against it, for his own security; and it will be for an auditor to state the account of it, and decide, in the first instance, what course the accountant is legally bound to pursue; and these will be matters entirely between the accountant and the persons interested in the trust, with which third persons claiming against the trust have nothing to do in the present proceedings.

Decree reversed, and case referred again to an auditor, to adjust and settle the accounts accordingly.